# STATE OF UTAH *v.* ALBERT F. HOLDEN.

### MASTER AND SERVANT—EIGHT-HOUR LAW—CONSTITUTIONALITY.

1. Plaintiff, in violation of a state law, employed one H. to labor in a mine more than eight hours per day. Upon fine and imprisonment, plaintiff petitioned the supreme court for a writ of *habeas corpus*, contending that the law limiting the time of labor in mines to eight hours a day was unconstitutional. Section 1, p. 219, Laws 1896, declares that "the period of employment of working men in all underground mines shall be eight hours per day, except in cases of emergency, where life or property is in imminent danger." The constitution having declared that "the legislature shall pass laws providing for the health and safety of employés in factories, smelters and mines," the court will not hold the act without such constitutional authority if there is any reasonable doubt that it is not calculated to promote the health and safety of such employés.

2. The court will not hold that an act is not within the police power of the state unless it is so clearly without as to remove every reasonable doubt that it is.

3. If the power of the legislature to pass the law is conceded, it cannot be said in this case there is any deprivation of liberty without due process of law.

4. While the powers of the national government consist of those delegated, those of the state government embrace such as are not forbidden.

5. The first clause of the fourteenth amendment to the constitution of the United States makes all persons described in it citizens of the United States, and of the state where they reside,—citizens of two distinct governments.

6. The second clause of the same section prohibits the state from denying to any person therein his privileges and immunities as a citizen of the United States. His privileges and immunities as a citizen of the state are left to the protection of the state.

7. The third clause of the section forbids the deprivation of life, liberty, or property, except by virtue of valid laws. If the state law in this case was valid, the process was valid.

8. The last provision of the section prohibits the denial by the state, to any person within its jurisdiction, the equal protection of the law. And a law may be limited to the dangers peculiar to a particular industry, without denying to any person the equal protection of the law.

(No. 725.   Decided Oct. 29, 1896.)

Application for writ of *habeas corpus* by Albert F. Holden, convicted in a justice's court of a violation of the eight-hour law respecting the employment of laborers in mines, against Harvey Hardy, sheriff.

Writ discharged, and petitioner remanded.

*Marshall & Royle, Dickson, Ellis & Ellis,* and *Bennett, Harkness, Howat & Bradley,* for petitioner.

The act is in violation of section 7, article 1, of the constitution of this state. "Sec. 7. Art. 1. No person shall be deprived of life, liberty or property without due process of law."

It is also in violation of section 1, article 14, of the constitution of the United States. "Sec. 1. Art. 14. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, lib-

erty or property without due process of law, or deny to
any person within its jurisdiction the equal protection of
the law."

What is due process of law?

"In the celebrated case of *Dartmouth College* v. *Wood-
ward*, 4 Wheaton 519, Mr. Daniel Webster gave the fol-
lowing definition of the due process of law: 'By the law
of the land, is more clearly intended, the general law;
a law which hears before it condemns; which proceeds
upon inquiry and renders judgment only after trial. The
meaning is, that every citizen shall hold his life, liberty,
property and immunities under the protection of the gen-
eral rules which govern society. Everything which may
pass under the form of an enactment is not, therefore,
to be considered the law of the land.'"

The privilege of contracting is both a liberty and a
property right. *Frorer* v. *People*, 141 Ill. 171; *Ramsey* v.
*People*, 142 Ill. 380; Cooley Const. Lim. 484.

The proposed law is class legislation in this:

It deprives mining and smelting employers of the right
to make contracts, which persons and corporations in all
other lines of business have the right to make. It de-
prives employers and employés in these lines of business
of the equal protection of the law. It is in violation both
of the spirit and letter alike of the constitution of the Uni-
ted States, and the state of Utah. *State* v. *Loomis*, 115 Mo.
307; *People* v. *Otes*, 90 N. Y. 48; *State* v. *Goodwell*, 33
W. Va. 179; *State* v. *Coal & Coke Co.*, 33 W. Va. 188;
*W. Va. Fire Creek Co.*, 6 L. R. A. 359; *Commonwealth* v.
*Perry*, 34 Cent. L. J. 78; *Millett* v. *People*, 117 Ill. 294;
*Frorer* v. *People*, 142 Ill. 387; *Ragio* v. *State*, 86
Tenn. 272; *Braceville Coal Co.* v. *People*, 147 Ill. 66;
*Perry* v. *Commonwealth*, 155 Mass. 117; *Eden* v. *People*,
161 Ill. 296; *In re 8-hour Law*, 39 P. R. (Colo.) 328;
*In re House Bill 107*, 39 P. R. (Colo.) 431; *Godcharles* v.

*Wigeman,* 6th Atl. (Pa. St.) 354; *Low* v. *Printing Co.,* 59 N. W. (Neb.) 362; *Ramsey* v. *People,* 142 Ill. 380.

In the case of *Ritchie* v. *The People,* 155 Ill. 98, a statute of Illinois was passed upon, providing: "No female shall be employed in any factory more than eight hours in any one day or forty-eight hours in any one week."

The act was held unconstitutional and in violation of fundamental principles, both as class legislation and as depriving women of the equal protection of the law.

In 98 N. Y. 98, *In re Jacobs,* the court had under consideration a law of New York prohibiting the manufacture of cigars and preparation of tobacco in any form in tenement houses, etc.

The law was held unconstitutional—the court says: "To justify this law it would not be sufficient that the use of tobacco may be injurious to some persons, or that its manufacture may be injurious to those who are engaged in its preparation and manufacture; but it would have to be injurious to the public health * * * What possible relation can cigar making in any building have to the health of the general public?"

The last quoted lines become very pertinent to the issue at bar: What possible relation can the limitation of hours of labor in mines and smelters have to the safety, health and welfare of the general public?

It is not a question whether the employment is injurious to the workman, but whether it is prejudicial to the health, comfort or safety of the general public.

On the other hand, if the exercise of such a power is constitutional, and not forbidden by the declaration of rights, it is manifest that a law could be enacted, which would provide that the period of employment should be twenty hours per day, and that no contract should be made or carried out contrary to its provisions, without

incurring the penalties denounced; and so such a power, if exercised, would prove an engine of destruction of the property rights and liberties of the workingmen.

The supreme court of Colorado has decided the precise question here presented, and held that, "it is not competent for the legislature to single out the mining, manufacturing, and smelting industries of the state, and impose upon them restrictions with reference to the hours of their employés, from which other employers of labor are exempt. An act such as proposed would be manifestly in violation of the constitutional inhibition against class legislation. The bill submitted also violates the right of parties to make their own contracts—a right guaranteed by the bill of rights, and protected by the fourteenth amendment to the constitution of the United States." 39 N. E. Rep. 329.

So it was held in Colorado in March, 1895, upon the same language in the declaration of rights, and also upon section 1 of the fourteenth amendment, the opinion citing many cases in the different states. *In re House Bill No. 203*, 39 S. E. Rep. 431-2. So in *Low* v. *Rees Printing Co.*, 24 Lawyer's Rep. Ann.

Speaking of the latest case from Missouri on these subjects with approval, *State* v. *Jnlow*, 31 S. W. 781, the circuit court further says: "The court then further holds that to deny a citizen the right to make free and valid contracts for his labor is to deprive him of 'liberty without due process of law,' and that any statute which undertakes to make such an act, otherwise innocent and lawful, a criminal offense, constitutes 'legislative judgment' without trial or sentence, and that any such legislation is unconstitutional and void. The court further finds the statute there unconstitutional, because it is class legislation—because it is a statute which undertakes to regu-

late the rights and conduct of one class of citizens, without reference to all other classes."

Laws of the character of the one in question have been held unconstitutional and void in California, Illinois, Colorado, Nebraska, Arkansas, Pennsylvania, West Virginia, Missouri and Ohio, and the principles upon which the decisions are grounded are to be found throughout the text books of the law, and the writings of our most learned and patriotic statesmen, and are supported by the great weight of authority, if not all the authorities, and upheld in the light of constitutional principles which cannot safely be ignored.

*C. S. Varian, O. W. Powers,* and *A. C. Bishop,* Attorney General, for the state.

Cited: *People* v. *Ewer,* 70 Hun 239; *On Appeal,* 141 N. Y. App. 129; *Peo.* v. *Warden,* 144 N. Y. App. 529; *Beers* v. *Mass.,* 97 U. S. 32; *People* v. *Bellett,* 99 Mich. 151; *Com.* v. *Hamilton Co.,* 120 Mass. 383.

The constitution is specific on this subject. It declares that eight hours shall constitute a day's work on public works, and further, commands that, "the legislature shall pass laws to provide for the health and safety of employés in factories, smelters and mines." Article 16, section 6.

This is mandatory. Article 1, section 26.

The determination of the question of regulation is, by this provision, committed to the legislature. The law enacted has relation to the purpose contemplated, and this ends the controversy.

Since 1888 a somewhat restricted right of eminent domain has attached by legislative grant to the business of mining. C. L. sec. 3841, *et seq.*; Laws 189, pp. 37-8-9.

By act, approved and taking effect April 5, 1896, six days after the act under consideration was approved, the business of producing and reducing ores was declared to be of "vital necessity to the people of the state of Utah;" to be a pursuit "in which all are interested and from which all derive a benefit."

In express terms, mining and milling (smelting) ore were declared to be for the *public use,* and the right of eminent domain was granted. Laws, 1896, p. 316.

The validity of similar legislation is established by decisions in a neighboring state. *Dayton Mining Co.* v. *Seawell,* 11 Nev. 394; *Overman Mg. Co.* v. *Corcoran,* 15 Nev. 148.

The mine and mill owners have sought and obtained a legislative declaration that their business was *for the public* use, with the accompanying right of eminent domain. They are within reasonable legislative control in the exercise of occupations claimed to be, and by legislative act *declared* to be, affected with a public use. The mine and mill owners can not successfully challenge the very authority by which they are permitted to exercise special privileges. *Munn* v. *Illinois,* 94 U. S. 113; *Budd* v. *New York,* 143 U. S. 517.

The grant of special privileges and particularly of the right to exercise the *state's right* of eminent domain, subjects the business to legislative control. *Georgia Banking Co.* v. *Smith,* 128 U. S. 179.

*Ritchie* v. *People,* cited from 155 Ill. 101, is much relied upon in support of petitioner's contention. The Illinois statute prohibited the employment of any female in any factory or workshop more than eight hours in any one day or forty-eight hours in any one week. In adjudging this statute to be unconstitutional, the court expressly concede—as was done in the prior Illinois cases above referred to—that under cer-

tain circumstances the regulation of employments is within the lawful authority of the state.

In the opinion it is said: "But there is nothing in the nature of the employment contemplated by the act which is in itself unhealthy or unlawful or injurious to the public morals or welfare."

And again: "It is not the nature of the things done, but the sex of the persons doing them, which is made the basis of the claim that the act is a measure for the promotion of the public health." "As a general thing, it is the province of the legislature to determine what regulations are necessary to protect the public health and secure the public safety and welfare."

But the court proceeds to say, and this is the *ratio decidendi:* "The mere fact of sex will not justify the legislature in putting forth the police powers of the state for the purpose of limiting the exercise of those rights, *unless* the courts are able to see that there is some fair, just and reasonable connection between such limitation and the public health, safety or welfare proposed to be secured by it." *Ritchie* v. *People,* 155 Ill. 98.

Finding nothing in the title nor act to indicate that it was a sanitary measure, and seeing nothing in the nature of the employment sought to be regulated, which in itself was unhealthy or injurious to public morals, the court refused to sustain the law.

*Chas. J. Pence* and *J. H. Murphy,* also for the state.

" *The party who wishes us to pronounce a law unconstitutional,* takes upon himself the *burden of proving beyond a doubt that it is so.*" Cited with approval by the court in *Powell* v. *Com.,* 114 Pa. St. at page 270.

And the same rule is announced in *State* v. *Coal Co.,* 36 W. Va. 835–838; *Munn* v. *Ill.,* 94 U. S. 123; *Pa. R. R.*

v. *Riblet*, 66 Pa. St. 164; *University of Cal.* v. *Barnard*, 57 Cal. 612; Sinking Fund Cases, 99 U. S. 718.

"Only when it violates the constitution *clearly, palpably, plainly,* and in such manner as to leave no doubt or hesitation in our minds." *Sharpless* v. *Mayor,* 59 Am. Dec. 782; *State* v. *Ah Chew,* 40 Am. Rep. 490; Marshall, C. J., in *Fletcher* v. *Peck,* 6 Cranch 87.

Cited with approval in *Ah Lim* v. *Ty,* 1 Wash. St. 159; *State* v. *Addington,* 77 Mo. 110; *State* v. *Laughlin,* 75 Mo. 147; *Leep* v. *Ry.,* 58 Ark. 414–415; *Newland* v. *Marsh,* 19 Ill. 385.

That the law may seem unreasonable, oppressive or absurd, or that there may be objection to its policy, are not questions for judicial inquiry. It must be in direct conflict with some *expressed* prohibition of the constitution. Cooley's Const. Lim. 164; *Pattison* v. *Yuba,* 13 Cal. 175; *Leonard* v. *Wiseman,* 31 Md. 201; *Com.* v. *Mc Williams,* 11 Pa. St. 61-70; *Davis* v. *State,* 3 Lea 376; *Williams* v. *Commack,* 27 Miss. 209; *Ah Lim* v. *Ty,* 1 Wash. St. 162.

"Due process of law undoubtedly means, in the due course of legal proceedings according to the rules and forms which have been established for the protection of private rights." 12 N. Y. 209; *Davidson* v. *New Orleans,* 96 U. S. 103.

"Legislation is not open to the charge of depriving one of his rights without *due process of law,* if it be general in its operation *upon the subjects to which it relates."* *Dent* v. *West Va.,* 129 U. S. 124; *Railroad* v. *Humes,* 115 U. S. 512; Miller, J., *In re Brosnahan,* 18 Fed. Rep. 67.

Under the powers inherent in every sovereignty a government may regulate the conduct of its citizens toward each other, and when necessary for the public good, the manner in which each shall use his property. *Munn* v. *Ill.,* 94 U. S. 113; *People* v. *Budd,* 117 N. Y. 14.

"It is now well established that the fourteenth amend-

ment created no new rights whatever, but only extended the operation of existing rights to a certain class (the negro) hitherto excluded, and furnished additional protection to such rights. The power to control and regulate civil rights of citizens is still reserved to the state, except that no distinction may be made between classes on account of *race, color or previous condition of servitude.*" 18 Am and Eng. Ency. Law, 755; *Barbier* v. *Connelly,* 113 U. S. 27; *U. S.* v. *Cruikshank,* 92 U. S. 542; Slaughterhouse Cases, 16 Wall. 36; *Mugler* v. *Kansas,* 123 U. S. 633 *et seq.*; *Butcher's Union* v. *Crescent City Co.,* 111 U. S. 746; *Stone* v. *Miss.,* 101 U. S. 814; *New Orleans Gas Co.* v. *Louisiana Lt. Co.,* 115 U. S. 650; *Beer Co.* v. *Mass.,* 97 U. S. 25; *Patterson* v. *Kentucky,* 97 U. S. 501; *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659-667; *Powell* v. *Penn,* 127 U. S. 678; *State* v. *Coal Co.,* 36 W. Va., 826.

And before the adoption of the fourteenth amendment the sole right of the state to regulate its internal trade, etc., in the exercise of the police power is recognized. License Tax Cases, 5 Wall. 462; *U. S.* v. *Dewitt,* 9 Wall. 41; *Com.* v. *Alger,* 7 Cush. 53.

The fact that the title of the statute does not declare that it is enacted for the health and safety of employés in smelters and mines is not important. This is not necessary for the validity of a penal statute. *Ah Lim* v. *Ty.,* 1 Wash. St. 165; *People* v. *West,* 106 N. Y. 297.

ZANE, C. J.:

The plaintiff was found guilty of a misdemeanor by a justice of the peace, who assessed a fine against him of $50, and, upon a refusal to pay, committed him. To obtain his liberty, he has presented this petition for a writ of *habeas corpus.*

The offense charged consisted of employing one William Hooley in underground mining more that eight hours

per day, in violation of a law entitled "An act regulating the hours of employment in underground mines, and in smelting and ore reduction works," as follows:

"Section 1. The period of employment of working men in all underground mines or workings shall be eight (8) hours per day, except in cases of emergency where life or property is in imminent danger.

"Sec. 2. The period of employment of workingmen in smelters and all other institutions for the reduction or refining of ores or metals shall be eight (8) hours per day, except in cases of emergency where life or property is in imminent danger.

"Sec. 3. Any person, body corporate, agent, manager or employer, who shall violate any of the provisions of sections 1 and 2 of this act, shall be deemed guilty of a misdemeanor."

This statute limits the hours of employment of laboring men in underground mines and smelters, or other works for the reduction of ores or refining of metals, to eight hours per day.

The question for our consideration and decision is, had the legislature the power to enact this law?

Article 16 of the constitution of this state is as follows (Laws Utah 1896, p. 219):

"Section 1. The rights of labor shall have just protection through the laws calculated to promote the industrial welfare of the state.

"Sec. 2. The legislature shall provide, by law, for a board of labor, conciliation and arbitration which shall fairly represent the interests of both capital and labor. The board shall perform duties, and receive compensation as prescribed by law.

"Sec. 3. The legislature shall prohibit: (1) The employment of women, or of children under the age of four-

14 UTAH—6

teen years, in underground mines. (2) The contracting of convict labor. (3) The labor of convicts outside prison grounds, except on public works under the direct control of the state. (4) The political and commercial control of employés.

"Sec. 4. The exchange of blacklists by railroad companies, or other corporations, associations or persons is prohibited.

"Sec. 5. The right of action to recover damages for injuries resulting in death shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation.

"Sec. 6. Eight hours shall constitute a day's work on all works or undertakings carried on or aided by the state, county or municipal governments; and the legislature shall pass laws to provide for the health and safety of employés in factories, smelters and mines.

"Sec. 7. The legislature, by approproate legislation, shall provide for the enforcement of the provisions of this article."

The first section of the act makes it the duty of the legislature to protect the rights of laboring men by the enactment of just laws calculated to promote the industrial welfare of the people,—such laws as will be just to all classes. The command is to the lawmaking department of the state, and the only express limitations upon the power are that such laws shall be just, and calculated to promote the welfare of the industrial classes. The legislature must decide whether the law is just and adapted to the purpose named; and unless the law is so palpably unjust, or so clearly not calculated to promote the purposes mentioned in the constitution, as to remove every reasonable·doubt that it is unjust, or that it is not calculated to promote the purpose expressed in the con-

stitution, the court should not hold it without the scope
of the authority mentioned in that instrument. The first
clause of section 6 declares that "eight hours shall con-
stitute a day's work on all works or undertakings car-
ried on or aided by the state, county or municipal gov-
ernment." We presume the object of this provision was
to protect the laboring man from the injurious conse-
quences of prolonged physical effort, and to give him the
remainder of the 24 hours for his own personal affairs,
and for the cultivation of his mental and moral powers,
the acquisition of useful knowledge, and for rest and
sleep. The second clause of the section commands the
legislature to pass laws "for the health and safety of
employés in factories, smelters and mines." This provi-
sion must be regarded as an expression of the will of the
people of the state with respect to the subjects and
objects of legislation named in it; and they possessed all
the power to enact laws with respect to such subjects
that the people of the United States had not conferred in
the national constitution exclusively on that government.
Any law adapted to the preservation of the health or
safety of employés in factories, smelters, or mines is
within the scope of this provision. The law must be con-
nected with some of the objects named, and calculated to
effect that purpose. If it is not so connected and adapted,
the court has the right to hold that it is not within the
scope of the provision. But, if there is a reasonable
doubt as to the connection and adaptation, the advisa-
bility must be held by the court to have been with the
lawmaking power. The court must be able to see clearly
that the law was not so connected before holding it void
for that reason. If the power to pass the law is conceded,
the court cannot set it aside because it may deem its
enactment unnecessary or injudicious, or because the
court may think that experience has proven it so, or

because the court may think itself more sagacious than the legislature, and can therefore see more clearly that the law will retard rather than promote progress and prosperity, and will be a detriment to the common good when actually applied to human affairs amid the conditions of the future.

This brings us to the question: Is the first section of the statute limiting the period of employment of laboring men in underground mines to eight hours per day, except in cases of emergency, where life or property is in imminent danger, calculated to protect the health of such laboring men? The effort necessary to successful mining, if performed upon the surface of the earth, in pure air, and in the sunlight, prolonged beyond eight hours, might not be injurious, nor affect the health of able-bodied men. When so extended beneath the surface, in atmosphere laden with gas, and sometimes with smoke, away from the sunlight, it might injuriously affect the health of such persons. It is necessary to use artificial means to supply pure air to men laboring in any considerable distance from the surface. That being so, it is reasonable to assume that the air introduced, when mixed with the impure air beneath the surface, is not as healthful as the free air upon the surface. The fact must be conceded that the breathing of pure air is wholesome, and the breathing of impure air is unwholesome. We cannot say that this law, limiting the period of labor in underground mines to eight hours each day, is not calculated to promote health; that it is not adapted to the protection of the health of the class of men who work in underground mines.

While the provision of the constitution under consideration makes it the duty of the legislature to enact laws to protect the health and to secure the safety of men working in underground mines, and in factories and

smelters, it does not prohibit the legislature from enacting other laws affecting such classes, to promote the general welfare. While the constitution of the United States is a delegation of powers to that government, with some express limitations upon the powers conferred, it also contains limitations upon the powers of the states. The government which it created is regarded as one of enumerated and delegated powers. On the other hand, while the state constitution contains some mandatory provisions, with others, distinguishing the departments of the government, and specifying the duties of various officers thereof, it contains many limitations upon the state, and is regarded in a general sense as a limitation upon the state government. The authority of the general government is ascertained from the powers delegated, while those of the state government are ascertained from those not prohibited. The powers of the first are described by those delegated, and the powers of the latter consist of those not prohibited. This leaves the state legislature in the possession of all the lawmaking power not prohibited to it by the constitution of the United States, or the laws made in pursuance of it, or by the state constitution. The enactment of some laws is made mandatory. The enactment of others is left to the discretion of the legislature, as the public welfare may demand. Among the mandatory provisions of the constitution of this state is the one under consideration.

It is claimed that the enactment of the statute in question was forbidden by section 7 of article 1 of the constitution of the state, which is that "no person shall be deprived of life, liberty or property without due process of law." The petitioner insists that his trial was not, and that his imprisonment is not, according to "the law of the land," because the statute fixing the period of labor of a laboring man in underground mines was, as he claims,

forbidden by the constitution, and therefore void. If the legislature had power to pass the law, there was no valid objection to his trial, fine and imprisonment. If the law was valid, the usual and ordinary process was adopted. If it was not valid, the defendant was deprived of his liberty without due process of law. It is also insisted that the provisions of the state law were forbidden by section 1 of amendment 14 of the constitution of the United States, as follows: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law." This section declares: (1) That all persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. They are made citizens of two distinct governments. (2) It declares that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The enactment of state laws depriving or abridging the privileges or immunities of citizens of the state is left to the state legislature so far as this provision goes. It secures to citizens of the United States, in any state, privileges and immunities of the citizens of that state. Expounding the provision now under consideration, the supreme court of the United States said: "The constitutional provision there alluded to did not create those rights which it called 'privileges' and 'immunities' of citizens of the state. It threw around them in that clause no security for the citizen of the state in which they were claimed and exercised; nor did it pro-

fess to control the power of the state government over the rights of its own citizens. Its sole purpose was to declare to the several states that 'whatever those rights, as you grant or establish them to your own citizens, or as you limit or qualify or impose restrictions on their exercise, the same, neither more or less, shall be the measure of the rights of citizens of other states within your jurisdiction.'" Slaughterhouse Cases, 16 Wall. 76. As the plaintiff is a citizen of this state, the second clause of the first section last above quoted has no bearing upon his case, as his privileges and immunities must be ascertained from the constitution of the state and its laws. The third clause of the section declares that no state shall "deprive any person of life, liberty or property without due process of law." This, in effect, is the same as section 7 of article 1, of the state constitution, and means process authorized by the law of the land. And, as we have seen, if the state law which the plaintiff was charged with violating was valid,—if the legislature had power to pass it,—there was no substantial objection to the process. It was suitable and proper to the nature of the case, and sanctioned by the established usages of the courts.

The last clause of section 1 of amendment 14 of the federal constitution declares that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The slaves in the various states in which slavery existed having been liberated during the late war, congress deemed it necessary to make them citizens of the United States, and forbade the states the denial to them the equal protection of the law. At that time the laws of all the states in terms gave equal protection to all white persons. This amendment, however, is general, and forbids the denial to any class of persons the equal protection of the laws, by any state; and we have no doubt that class legislation is forbidden. But some pur-

suits are attended with peculiar hazards and perils, the injurious consequences from which may be largely prevented by precautionary means, and laws may be passed calculated to protect the classes of people engaged in such pursuits. It is not necessary to extend the protection to persons engaged in other pursuits not attended with similar dangers. To them the law would be inappropriate and idle. So, if underground mining is attended with dangers peculiar to it, laws adapted to the protection of such miners from such danger should be confined to that class of mining, and should not include other employments not subject to them. And if men engaged in underground mining are liable to be injured in their health, or otherwise, by too many hours' labor each day, a law to protect them should be aimed at that peculiar wrong. In this way, laws are enacted to protect people from perils from the operation of railroads, by requiring bells to be rung and whistles sounded at road crossings, and the slacking of the speed of the trains in cities. So, the sale of liquor is regulated to lessen the evils of the liquor traffic, and other classes of business are regulated by appropriate laws. In this way, laws are designed and adapted to the peculiarities attending each class of business. By such laws, different classes of people are protected by various acts and provisions. In this way, various classes of business are regulated, and the people protected, by appropriate laws, from dangers and evils that beset them; safety is secured, health preserved, and the happiness and welfare of humanity promoted. All persons engaged in business that may be attended with peculiar injury to health or otherwise, if not regulated and controlled, should be subject to the same law; otherwise, the law should be adapted to the special circumstances. The purpose of such laws is not advantage to any person or class of persons, or disadvantage to any

person or class of persons. Necessary and just protection is the sole object.

An ordinance of the city and county of San Francisco prohibited the washing and ironing of clothes in public laundries and washhouses within certain prescribed limits of the city and county from 10 o'clock at night until 6 o'clock on the morning of the following day; and one Soon Hing was fined and imprisoned for a violation of it, and he petitioned for a writ of *habeas corpus,* on the ground that the ordinance was void, because it discriminated between the class of laborers engaged in the laundry business and those engaged in other kinds of business; that it discriminated between laborers beyond the designated limits and those within them; that it deprived the petitioner of the right to labor, and, as a necessary consequence, of the right to acquire property; and that the board had no power to pass it. The writ was denied by the lower court, and the judgment was brought before the supreme court of the United States, and affirmed by that court. Among other things, that court said, in its opinion: "The specific regulations for one kind of business, which may be necessary for the protection of the public, can never be the just ground of complaint because like restrictions are not imposed upon other business of a different kind. The discriminations which are open to objection are those where persons engaged in the same business are subject to different restrictions, or are held entitled to different privileges under the same conditions. It is only then that the discriminations can be said to impair that equal right which all can claim in the enforcement of the laws." *Soon Hing* v. *Crowley,* 113 U. S. 703; *Barbier* v. *Conolly,* 113 U. S. 27.

Our attention has been directed to the rule by which the court should be governed in deciding upon the constitutionality of the law in question, and reference is

made to the case of *Dartmouth College* v. *Woodward*, 4 Wheat. 629, wherein Chief Justice Marshall, in delivering the opinion of the court, said "that in no doubtful case would it [the court] pronounce a legislative act to be contrary to the constitution." In the Sinking Fund Cases the same court said: "Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this statutory rule." 99 U. S. 700; *Powell* v. *Pennsylvania*, 127 U. S. 678. In this last case the constitutionality of a statute of Pennsylvania, prohibiting the manufacture or sale, or offering for sale, or having in possession with intent to sell, oleomargarine butter, was questioned. No evidence was offered on the trial in the court even to prove that the oleomargarine was impure or unwholesome. On the contrary, there was an offer to prove that it was a wholesome and nutritious article of food, in all respects as wholesome as butter, produced from pure unadulterated milk, or cream from unadulterated milk. The court held that whether the manufacture of oleomargarine of the kind described in the statute involved such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit its manufacture and sale to go on, were questions of fact and of public policy which belonged to the legislative department to determine, and that the court could not interfere without usurping powers committed to the legislative department. The case of *People* v. *Warden of City Prison* held the enactment of a law prohibiting any person from exercising the calling of a master plumber without passing an examination, be-

fore a board of examiners, a valid exercise of the police power. In its opinion, the court further held that, if legislation is calculated to protect the public health and promote the public comfort and safety, the exercise of the legislative discretion is not the only subject of judicial review, but those measures must have some relation to those ends. 144 N. Y. App. 529.

We have examined a number of authorities to which reference has been made, and those which we deem most pertinent to the case in hand we will further examine in this opinion. Judge Cooley says: "Whether a statute is constitutional or not is always a question of power; that is, a question whether the legislature, in the particular case, in respect to the subject matter of the act, the manner in which its object is to be accomplished, and the mode of enacting it, has kept within the constitutional limits, and observed the constitutional conditions. In any case in which this question is answered in the affirmative, the courts are not at liberty to inquire into the proper exercise of the power. We must assume that legislative discretion has been properly exercised." Cooley, Const. Lim. (6th Ed.) p. 220. The same author says, at pages 200 and 201, "that except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case." Undoubtedly, sovereignty resides in the people, and their will is expressed in constitutions and laws,—in constitutions in the mode prescribed, and in statutes through the legislature; and, if the law is in harmony with the federal and state constitutions, it must stand until the lawmaking power changes it. It is the duty of the court to interpret, construe, expound, and apply the law, whether it be expressed in constitutions or in statutes, or whether it be the common law. But

courts have not been intrusted with the lawmaking power. That power is in the hands of another department of government. The supreme court of Massachusetts, in the case of *Com.* v. *Hamilton Manfg Co.*, held that a law declaring that a woman should not be employed at labor by any person, firm, or corporation in any manufacturing establishment more than 10 hours in any one day, except in certain cases, and in no cases more than 60 hours a week, was constitutional and valid. In deciding the point, the court said: "It does not forbid any person, firm, or corporation from employing as many persons or as much labor as such person, firm, or corporation may desire; not does it forbid any person to work as many hours a day or week as he chooses. It merely provides that, in an employment which the legislature has evidently deemed to some extent dangerous to health, no woman shall be engaged in labor more than ten hours a day or sixty hours a week. There can be no doubt that such legislation can be maintained, either as a health or police regulation, if it were necessary to resort to either of these sources for power. This principle has been so frequently recognized in this commonwealth that reference to the decisions is unnecessary." 120 Mass. 383.

In the case of *Ritchie* v. *People*, 155 Ill. 98, the following provision of a statute of that state was held unconstitutional and void: "No female shall be employed in any factory or workshop more than eight hours in any one day, or forty-eight hours in any one week." Act June 17, 1893, § 5. In deciding upon the law, the court said that the police power of the state enables it to promote the health, comfort, safety, and welfare of society, and that it was very broad and far-reaching, but that it was not without its limitations; that "legislative acts passed in pursuance of it must not be

in conflict with the constitution, and must have some
relation to the ends sought to be accomplished,—that is
to say, to the comfort, welfare, or safety of society." And,
further on, the court also said: "But the police power
of the state can only be permitted to limit or abridge
such a fundamental right, as the right to make contracts,
when the exercise of such power is necessary to promote
the health, comfort, welfare, and safety of society or the
public." Just preceding the statement of this propo-
sition, reference is made to an inference, and to a natural
law: "There is no reasonable ground—at least, none
which has been made manifest to us in the argument of
counsel—for fixing upon eight hours in one day as the
limit within which woman can work without injury to
her physique, and beyond which, if she works, injury
will necessarily follow." The court assumed a very wide
discretion in passing upon the reasonableness and appro-
priateness of the law, which is pronounced absolutely
void. In *Frorer* v. *People*, 141 Ill. 171, the court held
a statute unconstitutional which made it unlawful for
any natural or legal person, while in the business
of mining or manufacturing, to engage or be interested in
keeping or controlling any truck store, shop, or scheme
for the furnishing of supplies, tools, clothing, provisions,
or groceries to employés. The court said in its opinion
that, "in all that relates to mining and manufacturing
wherein they differ from other branches of industry, we
recognize the supremacy of the general assembly to deter-
mine whether any, and, if any, what, statutes shall be
enacted for their welfare, and that of operatives therein,
and necessarily affecting them alone. But keeping stores
and groceries or supplies of tools, clothing, and food, by
whatever name, to sell to laborers in mines and manu-
factories, is entirely independent of mining and manu-
facturing." And said, further, that it did not regulate

the duties of employer and employé in respect to mining; that it imposed disabilities as to contracting as to tools, clothing, and food, matters as to which all laborers in every other branch of industry are permitted to contract without any restriction. The principal objection to the law was that it was unequal. The court said that it was impossible, under the police power, that what is lawful if done by A, if done by B can be a misdemeanor, the circumstances and conditions being the same. A law of the state of New York to improve the public health by prohibiting the manufacture of cigars and the preparation of tobacco in tenement houses in certain cases was held unconstitutional by the court of appeals. While the act professed to be a health law, the court was of the opinion that it was not. The court said: "It is plain that this is not a health law, and that it has no relation to the public health,"—and for that reason held it of no effect. *In re Jacobs*, 98 N. Y. 98.

We do not agree with defendant's counsel that the business of mining is affected with a public interest, and the legislature had the power to pass the law for that reason. Mines are used by private persons or corporations, who have the exclusive use and control of them, as a farmer may own his farm, and have the exclusive use and control of it. The fact that the business may benefit the public does not give the public any interest in the mine or its business, or affect it with a public interest. It is not like the railroad business. Such property and business are owned by a private corporation, but the use of the road is in the public. Travelers and shippers have a common right to use the road for such purposes, by paying fares or freights. The same may be said of similar other classes of business affected with a public use and interest. On this point the court said, in the last-cited case: "Although the legislature may declare

it to be public, that does not necessarily determine its character. It must, in fact, be public; and, if it be not, no legislative fiat can make it so." *In re Townsend,* 39 N. Y. 171; *In re Deansville Cemetery Ass'n,* 66 N. Y. 569; *In re Eureka Basin Warehouse & Manuf'g Co.,* 96 N. Y. 42; *Rockwell* v. *Nearing,* 35 N. Y. 302.

But while the business of mining may not be affected with a public interest, the legislature may enact laws adapted to the promotion of the health and safety of men working in underground mines. Whatever difference of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does exist to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public good. The legislature cannot, by any contract, divert itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, *"Solus populi suprema lex;"* and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion can no more be bargained away than the power itself. *Beer Co.* v. *Massachusetts,* 97 U. S. 25.

The section of the statute whose constitutionality is involved in this case includes all employés and employers engaged in working underground mines. None are omitted who may be subject to the peculiar conditions that attend such mining. The provision of the state constitution quoted makes it the duty of the legislature to "pass laws to provide for the health and safety of employés in factories, smelters and mines." And we are not authorized to hold that the law in question is not calculated and adapted in any degree to promote the health and safety of persons working in mines and smelt-

ers.    Were we to do so, and declare it void, we would usurp the powers intrusted by the constitution to the lawmaking power.    The discharge of the petitioner is denied, and he is remanded to the custody of the sheriff named, until discharged according to law.

Bartch and Miner, JJ.:  In concurring in this opinion we do not wish to be understood as concurring in that part of it wherein it is stated:   "We do not agree with defendant's counsel that the business of mining is affected with a public interest, and the legislature had the power to pass the law for that reason;" "that the business of mining is not affected with a public interest;" or that the public have no interest in mining, etc.    To this part of the opinion we withhold our assent.    The question is too important to be passed upon without full argument and investigation.